UNITED STATES et al. v. FLETCHER et al. (two cases).

Nos. 1872, 1873.

District Court, D. Idaho, S. D.

Sept. 18, 1934.

See, also (D. C.) 8 F. Supp. 233.

John A. Carver, U. S. Dist. Atty., and E. H. Casterlin, Asst. U. S. Dist. Atty., of Boise,

Idaho, J. Howard Marshall, of Washington, D. C., and Norman M. Littell, of Seattle, Wash., for plaintiffs.

Carey Nixon and Dean Driscoll, both of Boise, Idaho, and Clinton H. Hartson, Shorts & Denney, and McMicken, Ramsey, Rupp & Schweppe, all of Seattle, Wash., for defendants.

CAVANAH, District Judge.

After the motions to dismiss and to strike having been denied, on the orders to show cause why a temporary injunction should not issue during the pendency of the actions, numerous affidavits and testimony were presented by the respective parties.

The issues now to be determined are of fact, and go to the question of whether the plaintiffs have made out such a prima facie case showing the right to final relief and if temporary injunction is necessary to preserve the right asserted by the plaintiff during the pendency of the actions.

Analysis of the bills was made by the court when the motions were disposed of, and it becomes unnecessary now to repeat them. The principal controlling issues of fact appear to be:

(A) Was the commodity loaded on board the tankers Papoose and Republic an illegal one at the time of shipment from the state of Texas under the National Industrial Recovery Act, the executive order of the President, and the laws of the state of Texas and the regulations of the Railroad Commission?

(B) Were the cargoes illegally produced and loaded aboard the tankers Papoose and Republic, and, if so, did they move in interstate commerce, and were they such as Congress had power under the Commerce Clause of the Constitution to prohibit?

The bill in case 1872 relating to the shipment in the tanker Papoose alleges that during May, June, and July, 1934, the Railroad Commission of the State of Texas prescribed total quotas of allowable production from the East Texas Oil Field of 14,518.467; 15,148.913; and 14,521,557 barrels, respectively, and divided such total allowable to the field proportionately among the wells in the field, and that during these months there was illegally produced crude petroleum in this field, represented by oil moved and refined without tender or certificate of clearance as required by the regulations of the state commission; that some of such oil produced and withdrawn from storage was represented by certain number of refineries located in the fields were by them shipped to tidewater terminals of the American Petroleum Company located near Houston, Tex., and some of which was loaded aboard the tanker Papoose on July 31, 1934, in the amount of 70,000 barrels for transportation from Texas to Pacific Coast states and consigned to the defendant Fletcher Oil Company.

The bill in case 1873 relating to the shipment in the tanker Republic alleges that about August 11, 1934, the Harbor Terminal Company at Texas City, Tex., received from the Roco Refining Company of Kilgore, Tex., four tank cars containing gasoline, aggregating 31,656 gallons and discharged into either Tank 1 or Tank 4 of the Harbor Terminal Company's storage facilities. That there was from August 1 to August 12, 1934, 54,619.67 barrels of gasoline from various sources collected in Tanks 1 and 4 of the storage facilities of the Harbor Terminal Company for the cargo for the tanker Republic and which was loaded on August 12, 1934, from Tanks 1 and 4, 51,621.24 barrels of gasoline; that between August 1 and 12, 1934, no gasoline was withdrawn from either of Tanks 1 and 4 save for the cargo of the tanker Republic; that during May, June, and July, 1934, the Roco Refining Company was not granted any approved tender, for movement of crude petroleum to its plant, which is required by statute and regulations of Texas; that some of the petroleum and products thereof, so produced and withdrawn from storage, constituted a portion of the cargo of the tanker Republic transported from Texas to the states of Washington and Idaho for the Fletcher Oil Company; and it is further alleged that neither the consignors nor consignees, nor any other person, ever received any tender or certificate of clearance covering the crude oil from which the cargo of the vessel was refined or manufactured.

In answer to those allegations which relate to the issue "A," it is alleged that the proof fails to establish: First. That the gasoline constituting the cargo of the tanker Papoose and the tanker Republic was not at the time of the shipment prohibited from being withdrawn from storage and transported in interstate commerce under either section 9 (c) of the National Industrial Recovery Act (15 USCA § 709 (c) or the Executive Order of the President of July 11, 1933 .(15 USCA § 709 note), or the laws of Texas or regulations of its Railroad Commission, as the national law and executive order related only to petroleum and products thereof, and the laws of Texas and its regu-

lations only prohibit such production and withdrawal from storage of petroleum and not gasoline.

Section 9 (c) of the National Industrial Recovery Act (15 USCA § 709 (c) reads: "The President is authorized to prohibit the transportation in interstate and foreign commerce of petroleum and the products thereof produced or withdrawn from storage in excess of the amount permitted to be produced or withdrawn from storage by any State law or valid regulation or order prescribed thereunder, by any board, commission, officer, or other duly authorized agency of a State. Any violation of any order of the President issued under the provisions of this subsection shall be punishable by fine of not to exceed $1,000, or imprisonment for not to exceed six months, or both."

The Executive Order of the President of July 11, 1933 (see 15 USCA § 709 note), reads: "By virtue of the authority vested in me by the act of Congress entitled 'An Act To encourage national industrial recovery, to foster fair competition, and to provide for the construction of certain useful public works, and for other purposes,' approved June 16, 1933 (Public No. 67, 73d Congress), the transportation in interstate and foreign commerce of petroleum and the products thereof produced or withdrawn from storage in excess of the amount permitted to be produced or withdrawn from storage by any State law or valid regulation or order prescribed thereunder, by any board, commission, officer, or other duly authorized agency of a State, is hereby prohibited."

The provisions of the law of Texas (Vernon's Ann. Civ. St. Tex. art. 6049c, § 5) read:

"The Railroad Commission shall have the power, and it shall be its duty from time to time, to inquire into the production, storage, transportation, refining, reclaiming, treating, marketing, or processing of crude oil and/or natural gas, and the reasonable market or consumer demand therefor, in order to determine whether or not waste exists or is imminent, or whether the conservation laws of Texas or the orders of the Railroad Commission are being violated. It shall be the duty of all persons, companies, or corporations producing, storing, transporting, refining, reclaiming, treating, marketing, or processing crude oil or natural gas, to keep accurate records as to the amount of such products produced, stored, transported, refined, reclaimed, treated, marketed, or processed by such person, company, or corporation; and as to the source from which such person, company, or corporation has produced, obtained, or received crude oil, natural gas, or the products of either, and the disposition made of same."

The Railroad Commission of Texas shall have authority to make rules and regulations for the enforcement of the provisions of this act.

"It shall be the duty of all parties producing, storing or transporting crude petroleum oil or natural gas within this State, to make and to keep in this State a permanent record or copies of records of the quantity or amount of all such oil or gas so produced, stored or transported within this State." Section 6.

"The purchase, transportation or handling of crude petroleum oil or natural gas produced from any property in excess of the amount allowed by any statute or any rule, regulation or order of the Commission is hereby prohibited, and the Commission shall have power to enjoin any violation of this section." Section 14.

"It shall be unlawful for any person owning, leasing, operating or controlling any oil property within the State of Texas to permit the oil or gas so produced to pass beyond the possession or control of such person into the possession or control of any other person without first accurately measuring the amount of such oil or such gas, and making and preserving an accurate record thereof." Vernon's Ann. P. C. Tex. art. 1112b, § 2.

"It shall be unlawful for any such person mentioned in Section 2 of this Act to use any method or device to evade the accurate measurement provided for in Section 2 hereof and it shall be unlawful for any such person to use any method or device to prevent obtaining an accurate measurement of such production." Section 3.

"It shall be unlawful for any person, as defined in this Act, owning, leasing, operating, producing, or controlling any oil property or oil well within this State to produce or cause to be produced on any day from any such oil property or oil well any oil in excess of the amount allowed to be produced per day from any such oil property or oil well under any order or orders of the Governmental Agency, theretofore promulgated and in force at the time." Section 7a.

It appears clear from a reading of the National Act that Congress has, in express words, authorized the President, by order, to prohibit the transportation in interstate com-

merce of petroleum or products thereof, produced or withdrawn from storage in excess of the amount permitted to be produced or withdrawn from storage by any state law or regulation prescribed thereunder, and that the executive order prohibits such transportation of petroleum or products thereof. The authority of the President to act is limited, by the act to prohibit the transportation of petroleum and products thereof, to the laws of the state or any regulation prescribed thereunder. We must, then, before the President can prohibit the transportation of petroleum products, refer to the laws of the state of Texas and the regulations prescribed thereunder. Both the Texas law and its regulations, at the time these shipments were made, limited the production and withdrawal to crude petroleum. Now, to bring the cargoes of gasoline of the tankers Papoose and Republic under the Texas law or its regulations, gasoline must be treated as a product of crude petroleum, and an interpretation will have to be given to the national act and the law and regulation of Texas that petroleum includes gasoline, a product thereof. When Congress and the Legislature of Texas and the commission were considering the regulating of petroleum, it is reasonable to say that when they were limiting the amount of production and withdrawal from storage, they intended to protect the commodity, and to prohibit its overproduction and withdrawal from storage, and when such overproduction and withdrawal is delivered to a refinery and manufactured into gasoline, it does not remove the intent of the law and the regulation to regulate it in its state when extracted from the wells. If petroleum has been produced and withdrawn from storage in excess of a state law or valid regulation and delivered to a refinery, the violation then occurs before it is manufactured into gasoline and because it is, thereafter, by some process refined and manufactured into gasoline, it cannot destroy it as a commodity intended to be regulated, as such a process does not in reality eliminate the existence of the petroleum, because gasoline is nothing but a product of it. The law and regulation cannot be evaded by taking the petroleum and manufacturing it into gasoline. The substance of petroleum still exists. Should the interpretation of the statutes and regulations be given, as urged by the defendants, then, the purpose and administration of the law would be defeated.

■ (A) The cargo of the Papoose was 70,-000 barrels of gasoline which was loaded aboard it at the tidewater terminal of the American Petroleum Company near Houston, Tex., for transportation from there to the Pacific Coast states, and consigned to the defendant the Fletcher Oil Company. There is a sharp conflict in the proof as to where this gasoline came from before loading aboard the vessel, and whether it was legally produced and withdrawn from storage under the laws and the regulations of Texas; the plaintiff contending that they have, by their proof, traced it from the wells in the East Texas Oil Field into the refineries and from there into the terminals and commingled with other oil, and that it was manufactured from illegal crude oil, and therefore comes under the laws and regulations of Texas which cover crude petroleum; while the defendants assert that the cargo came from the refineries where it cannot be determined whether it was illegally produced and withdrawn from storage as there may have been and was in the tanks of the refineries other gasoline that was legally produced.

The regulations adopted by the Railroad Commission of Texas and in force at the time of the shipments required that oil be measured by being run directly from the well from which it is produced into lease tank for gauging and there gauged by the producer and a record thereof kept and used as a basis for such production reports to be made to the commission. Such tanks shall have a tank battery and be located on the lease on which the well whose oil is being measured is located, or an adjoining lease. All land or royalty owners are required to check all oil produced in the field. All producers, purchasers, pipe-line carriers of crude petroleum shall equip their gathering line from field storage tanks with lock-stops; no oil shall be produced during any proration period in excess of the allowable production for such period. It is a violation of the regulation for any person to deliver to any purchaser, transporter, or receiver of any amount of oil in excess of the allowable, and when any oil is so transported, an affidavit of the same shall be furnished. No oil shall be produced, transported, or received for storage except in accordance with the requirements of the regulations. Thus it will be seen that the laws of Texas and the regulations required certain things to be done by those producing and storing crude oil before it can be produced or withdrawn from storage, sold, or transported, and should any of such oil or gasoline which is a part of and a product thereof be produced or withdrawn, these requirements

of the state statute and regulations have to be complied with, otherwise it would be a violation thereof, and the same would become an illegal commodity.

The problem then is: Do the affidavits and testimony presented show that the cargoes loaded aboard these two vessels were produced or withdrawn from storage prior to and at the time of shipment in violation of the laws and the regulations of Texas in force at the time? If not, then section 9 (c) of the National Industrial Act and the executive order of the President could not be invoked.

The refineries from which it is claimed by the plaintiffs that the cargoes came, are named in the bill, and there are affidavits of certain employees of the state commission who had been in active charge of the pipe-line and refineries department of the commission, and engaged in the investigation of violations of regulations as the same relate to the production, transporting, and refining of crude petroleum of the East Texas Oil Field, stating that such violations existed, and that the records of the commission do not show that these refineries had received tenders; that there was no reason why tenders, without delay, could not have been received; that repeated requests to recommend for approval the tenders for the cargo of the Papoose were made but not approved. The American Petroleum Company, who filled the order of the cargo of the tanker Papoose, has three 80,000-barrel tanks; when gasoline is refined from crude petroleum by its producers at the plant, it is then run to any one of the three tanks indiscriminately; and when gasoline was refined from crude petroleum, it is so commingled in the tanks that it is impossible to segregate any one lot of gasoline from the other as it is so placed in these tanks. After it is placed in the tanks it is then lifted from storage into the tankers for waterway movement, and the tanker might be loaded from any one of the three tanks, or partly from all of them.

The cargo loaded on the tanker Republic and referred to in case 1873 was gasoline shipped on August 12, 1934, from the Harbor Terminal Company at Texas City, Tex., and the identity of that cargo is also in dispute. Tracing of it from the time it was drawn from the wells in the East Texas Oil Field to the refineries and then to the storage tanks of the Harbor Terminal Company, from which it was loaded aboard the tanker Republic, and whether it was produced and withdrawn from storage in violation of the laws and regulations of Texas, has not been an easy task for the court.

The principle of commingling of legal goods with illegal goods where it is impossible to separate the legal from the rest requires forfeiture of the whole, is urged by the plaintiffs to apply to this cargo. If it be possible under the proof to identify and separate any portion of this cargo as legally produced and withdrawn from storage in Texas, of course, no injunction should issue prohibiting its transportation in interstate commerce. Where, then, did the Harbor Terminal Company secure this gasoline? Was it, as the cargo of the Papoose, illegally produced and withdrawn from storage by the refineries and others who had not complied with the laws and regulations of Texas, or was it refined and manufactured by refineries who had complied with the Texas laws and regulations?

The plaintiffs' proof tends to show that the gasoline discharged to Tanks 1 and 4 of the Harbor Terminal Company from which the cargo was secured, was from refineries who had not received approved tenders as required by the laws and regulations of Texas and particularly the four tank cars containing 31,656 gallons, and that there was 54,619.67 barrels of gasoline on August 12, 1934, in storage in the tanks of the Harbor Terminal Company, and there was delivered on that date of such storage tanks and lines into the tanker Republic 51,621.24 barrels. This cargo was taken from storage tanks which at the time had gasoline in, which was illegal as it had been secured from refineries who had withdrawn it from storage in violation of the Texas laws and regulations. It was such a commodity that Congress had power, under the Commerce Clause of the Constitution, to prohibit its transportation in interstate commerce.

As the conclusion is reached that the cargoes of the tanker Papoose in case 1872, and of the tanker Republic in case 1873, were produced and withdrawn in violation of the laws and regulations of the state of Texas and transported in interstate commerce, a temporary restraining order will be issued in each case restraining the defendants as prayed for in the bills.